```
 1                    UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF INDIANA
 2                         HAMMOND DIVISION

 3   UNITED STATES OF AMERICA,      )
                                    )
 4        Plaintiff,                )
                                    )
 5   vs.                            )  2:17-CR-47
                                    )
 6   RICHARD SMITH,                 )
                                    )
 7        Defendant.                )

 8              TRANSCRIPT OF MOTION TO SUPPRESS HEARING
                         February 13, 2018
 9               BEFORE THE HONORABLE PHILIP P. SIMON
                      UNITED STATES DISTRICT JUDGE
10


11


12   A P P E A R A N C E S:

13   FOR THE GOVERNMENT:

14                        THOMAS R. MAHONEY
                          United States Attorney's Office
15                        5400 Federal Plaza, Suite 1500
                          Hammond, Indiana  46320
16                        (219) 937-5500

17   FOR THE DEFENDANT:

18                        MICHAEL W. BOSCH
                          Attorney at Law &
19                        3235 45th Street, Suite 301
                          Highland, Indiana  46322
20                        (219) 972-2000

21


22


23


24


25
```

```
 1            (The following proceedings were held in open court

 2       beginning at 10:10 a.m., reported as follows:)

 3            DEPUTY CLERK:  All rise.

 4            THE COURT:  You can be seated.  Good morning,

 5   everyone.

 6            MR. MAHONEY:  Good morning.

 7            MR. BOSCH:  Good morning.

 8            THE COURT:  Okay.  We're on the record in -- the

 9   Cause No. is 2:17-CR-47, the case is United States versus

10   Richard Smith, and we're here for a suppression hearing.

11   Mr. Bosch had filed a motion back in early, mid-January, and I

12   have all the response and the reply that I have read, and so

13   I'm ready to hear the evidence in the case.

14        Mr. Bosch is here, along with his client, Mr. Smith; and

15   Mr. Mahoney is here on behalf of the government, and I know

16   Mr. Padilla, but who else is with you here?

17            MR. MAHONEY:  Your Honor, this is Detective

18   Nicholas Wardrip.  He's the case agent on the matter.  He is

19   assigned to FBI GRIT task force.

20            THE COURT:  Okay.  Good enough.

21        So I know you submitted the DVD to me.  I didn't have a

22   chance to look at it yet, so I'm hoping -- it is short, right?

23   It is, like, 13 minutes?

24            MR. MAHONEY:  It is, Your Honor, and we had a little

25   technical problem this morning, so we asked to borrow what I
```

 1   had filed.  And we are going to play that in court, and then we

 2   will tender it back to the Court.

 3          THE COURT:  Okay.  So why don't you guys -- I mean, I

 4   know your position is he isn't even entitled to a hearing.

 5   But, you know, I'm -- I have a pretty flexible view of that,

 6   and I would just as soon take a look at the video myself and

 7   arrive at my own conclusion, so we're going to proceed with the

 8   hearing.

 9       So why don't you give me a little preview of what you

10   intend to do today.

11          MR. MAHONEY:  Your Honor, the hearing itself, it is

12   not going to be very complex.  I don't anticipate it will be

13   very long.

14       What we intend to present today is that Richard Smith, the

15   defendant who's here in court today with his attorney, was part

16   of a criminal drug conspiracy.  He was arrested on June 21st

17   in another matter, and he was in custody on that matter.

18       June the 22nd the grand jury in the Northern District of

19   Indiana returned a true bill, and there was an arrest warrant

20   issued.

21          THE COURT:  Was that by happenstance?

22          MR. MAHONEY:  He was involved in two different

23   drug-selling organizations.  It wasn't so much happenstance as

24   the officers knew that he had a court date at Lake County on

25   the 21st, and then that's where they met him, and that's

1    where they brought him into custody.

2         **THE COURT:**  Okay.

3         **MR. MAHONEY:**  So the arrest warrant is issued on the

4    22nd for this matter, and then he's interviewed early on the

5    23rd at about 10:30 in the morning.

6         **THE COURT:**  When was he arrested on the state charge?

7         **MR. MAHONEY:**  State charge was on the 21st.

8         **THE COURT:**  Did he have a lawyer appointed to him

9    yet?

10        **MR. MAHONEY:**  I don't know.

11        **THE COURT:**  Okay.

12        **MR. MAHONEY:**  I'm not quite sure.

13        **THE COURT:**  And then the interview is on the 22nd

14   that we are about to see?

15        **MR. MAHONEY:**  No.  The grand jury in this matter

16   returned a true bill on the 22nd, and then an arrest warrant

17   was issued in this case.  And then it was after that he was

18   interviewed on the morning of the 23rd.

19        **THE COURT:**  The 23rd, okay.  All right.  Fair enough.

20      So we'll be, you know, seeing the DVD.  What else are you

21   intending to present?

22        **MR. MAHONEY:**  I have a few questions of

23   Detective Wardrip regarding the circumstances surrounding the

24   interrogation before and afterwards and to flesh out whether

25   there was any psychological or physical coercion of any type.

```
 1            THE COURT:  Okay.  Fair enough.

 2            MR. MAHONEY:  And those are pretty much what I'm

 3    going to ask for.

 4            THE COURT:  Okay.  Mr. Bosch, how about from your

 5    point of view?

 6            MR. BOSCH:  It is very straightforward.  I'm glad you

 7    are going to look at the video; that's all we ever really

 8    wanted in this case.  And as I said in my motion, you'll see a

 9    spot in the video where the agent says:  You are not feeling

10    good today?  You drug sick?

11        And he was and he was still high.

12        I questioned my client:  How could he still be high two

13    days later after you were taken into custody.

14        And his response was and will be, if he has to testify,

15    that they didn't do a real good job of searching him and he had

16    some heroin in his pocket that he snorted while he was in

17    custody.

18            THE COURT:  Okay.  Well, fair enough.

19        So Mr. Mahoney, I'll turn it over to you.

20            MR. MAHONEY:  We ask to call Detective

21    Nicholas Wardrip.

22            THE COURT:  All right.  Sir, if you want to come

23    forward.

24        If you would raise your right hand to take an oath, this

25    lady will swear you in.
```

```
 1          (The oath was administered.)

 2              THE WITNESS:  Yes.

 3              THE COURT:  You may be seated.

 4          Mr. Mahoney.

 5              MR. MAHONEY:  Thank you.

 6              NICHOLAS WARDRIP, GOVERNMENT WITNESS, SWORN

 7                        DIRECT EXAMINATION

 8   BY MR. MAHONEY:

 9   Q.   Good morning, sir.

10        Would you please state your name and spell your first and

11   last name for the benefit of the reporter.

12   A.   Nicholas Wardrip; N-I-C-H-O-L-A-S, W-A-R-D, as in David,

13   R-I-P, as in Paul.

14   Q.   Detective, are you employed?

15   A.   Yes.

16   Q.   How are you employed?

17   A.   With the City of Hobart Police Department.

18   Q.   How long have you been with the City of Hobart Police

19   Department?

20   A.   Since January of 2004.

21   Q.   And what is your current rank as a Hobart police officer?

22   A.   Detective assigned to the FBI Gang Investigation -- or

23   Gang Response Investigative Team, GRIT.

24   Q.   Is that an FBI task force?

25   A.   Yes.
```

1  **Q.**   And are you a task force officer?

2  **A.**   Yes.

3  **Q.**   As part of your duties as a task force officer, were you

4  assigned to the investigation of a drug trafficking -- criminal

5  drug conspiracy operating out of Gary, Indiana, in 2016 and

6  2017?

7  **A.**   Yes.

8  **Q.**   And as part of the investigation, had you identified

9  Richard Smith as a person who was participating in that

10 conspiracy?

11 **A.**   Yes.

12 **Q.**   And was Mr. Smith's role in the conspiracy basically to

13 work as a security person for a drug house?

14 **A.**   Yes.

15 **Q.**   And did he work as a security person by patrolling the

16 perimeter of the drug house and using a walkie-talkie?

17 **A.**   Yes.

18 **Q.**   Richard Smith, was he under investigation in any other

19 matters that you are aware of?

20 **A.**   Yes, he was.

21 **Q.**   And what was that?

22 **A.**   Another drug trafficking organization.

23 **Q.**   Not this drug trafficking organization?

24 **A.**   A separate one, correct.

25 **Q.**   And I'm going to direct your attention now to June the

```
 1   21st of 2017.  Were you working that day?

 2   A.    Yes.

 3   Q.    And were you -- any of your fellow agents know that

 4   Richard Smith was going to be at the Lake County criminal court

 5   building that morning?

 6   A.    Yes, Detective Frank Carillo.

 7   Q.    And at approximately 8:30 to 9:00 a.m., did Detective

 8   Frank Carillo make contact with Richard Smith?

 9   A.    Yes.

10   Q.    And did he take Richard Smith into custody that morning?

11   A.    He did.

12   Q.    And did he then bring him to the Hobart City Police

13   Department?

14   A.    Yes.

15   Q.    Was Richard Smith held in custody that day?

16   A.    Yes.

17   Q.    I want to ask you then about the next day, June the 22nd

18   of 2017.

19         Did you testify before the federal grand jury here in

20   Hammond, Indiana?

21   A.    I did.

22   Q.    And that's for the Northern District of Indiana?

23   A.    Correct.

24   Q.    And after your testimony, did the grand jury return what

25   is known as a true bill?
```

1   **A.**   Yes.

2   **Q.**   And is that an Indictment that was issued in this case?

3   **A.**   Yes.

4   **Q.**   And as part of that Indictment, was there also an arrest

5   warrant issued for a number of people who were participants in

6   the criminal drug conspiracy?

7   **A.**   Yes.

8   **Q.**   And was one of those persons Richard Smith?

9   **A.**   Yes.

10   **Q.**   I ask you to look around the courtroom.  Do you see

11   Richard Smith here today?

12   **A.**   Yes.

13   **Q.**   Would you please point to him and tell us what he's

14   wearing?

15   **A.**   He's the gentleman at the table wearing the gray and dark

16   gray shirt.

17           **MR. MAHONEY:**  Your Honor, for the record, he's

18   identified Richard Smith.

19           **THE COURT:**  Yes.

20   **BY MR. MAHONEY:**

21   **Q.**   The next morning at approximately 10:33 a.m., was

22   Richard Smith still in custody at the Hobart City Jail?

23   **A.**   Yes.

24   **Q.**   And did you and your fellow officers interview

25   Richard Smith?

1    **A.**    Yes.

2    **Q.**    And was Richard Smith brought into an interview room at

3    the Hobart City Jail?

4    **A.**    He was.

5    **Q.**    The entire interrogation, including the advice of rights,

6    which I'm going to get to in a minute, was that all videotaped?

7    **A.**    Yes.

8    **Q.**    I'm going to -- as part of your interview, did you

9    introduce yourselves?

10   **A.**    Yes.

11   **Q.**    And after you introduced yourselves, did you advise

12   Mr. Smith of anything?

13   **A.**    His constitutional rights.

14   **Q.**    And did you do those from a preprinted advice of rights

15   form?

16   **A.**    Yes.

17   **Q.**    I'm going to show you --

18            **THE COURT:**   You will have to switch, Noel, to the

19   ELMO.

20   **BY MR. MAHONEY:**

21   **Q.**    Detective, I'm going to show you what's been marked as

22   Government's Exhibit No. 1.  Can you take a look at that and

23   tell us what that is?

24   **A.**    That's the FBI's FD-395 form, which is the advice of

25   rights.  It's got my handwriting for the place, the date, and

1    the time, and then the signature of Richard Smith, and then my

2    signature as a witness.

3    **Q.**    Now, is that dated June the 23rd, 2017, at 10:30 a.m.?

4    **A.**    Yes.

5    **Q.**    And does it have your signature at the bottom?

6    **A.**    Where it says "witness," yes.

7    **Q.**    And does it also have Richard Smith's signature?

8    **A.**    Yes.

9    **Q.**    And is that a true and accurate depiction -- or a true and

10   accurate copy of the advice of rights form that you filled out

11   and read Richard Smith his constitutional rights from?

12   **A.**    Yes.

13   **Q.**    Now, when you advised Mr. Smith of his rights, did you do

14   it off of this form?

15   **A.**    Yes.

16   **Q.**    And did you read it to him?

17   **A.**    Correct.

18   **Q.**    Did he follow along with you in any way while you were

19   reading it to him?

20   **A.**    Yes.

21   **Q.**    And after you read it to him, did you ask him if he would

22   agree to speak to you?

23   **A.**    Yes.

24   **Q.**    And did Richard Smith agree to speak to you?

25   **A.**    He did.

1    **Q.**   And did you then conduct an approximately 13-minute-long

2    interrogation of Richard Smith?

3    **A.**   Yes.

4    **Q.**   And during the course of that interrogation, did

5    Richard Smith -- was he responsive to you?

6    **A.**   He was.

7    **Q.**   Did he respond to your questions?

8    **A.**   He did.

9    **Q.**   Did he answer all of your questions?

10   **A.**   Yes.

11   **Q.**   Did he evade some of your questions?

12   **A.**   Yes.

13   **Q.**   And some of the questions that you asked, did he question

14   whether or not he should give you an answer or not?

15   **A.**   Yes.

16   **Q.**   Now, at any time during the course of the 13-minute

17   interrogation, or even before that, was Richard Smith -- did he

18   appear to be under the influence of drugs?

19   **A.**   No.

20   **Q.**   Did he appear to be -- did he appear in any way that he

21   didn't understand what you were saying to him?

22   **A.**   He didn't appear to not understand.  He did seem -- he was

23   yawning.  At one point, I did ask him if he was feeling okay,

24   and I didn't know if he wasn't feeling well or if he was

25   just -- didn't want to talk.  Because sometimes when we talk to

1    people, you know, they just don't want to talk to us.

2    **Q.**   Sure.

3    **A.**   So I didn't know.  He was kind of -- his posture was kind

4    of guarded, kind of defensive.  He kind of seemed like -- you

5    know, I had never -- well, I had only met him on one other

6    occasion, but he just -- he had -- I didn't know if he had an

7    attitude or what his deal was, so I was asking him, you know,

8    how he felt because of his demeanor.

9    **Q.**   Okay.  And did he respond to you?

10   **A.**   Yes.

11   **Q.**   Did he ever fall asleep during the interview?

12   **A.**   No.

13   **Q.**   And did he answer every question you asked of him in some

14   fashion?

15   **A.**   Yes.

16   **Q.**   Now, you testified that the entire interrogation was

17   videotaped?

18   **A.**   Yes.

19   **Q.**   At any time while Richard Smith was in custody at the

20   Hobart Police Department, did you or any of your fellow

21   officers threaten him in any way?

22   **A.**   No.

23   **Q.**   Did you ever coerce him in any way, either psychologically

24   or physically?

25   **A.**   No.

 1   **Q.**   Did Richard Smith ever make any complaints of coercion by

 2   you or any of your fellow officers?

 3   **A.**   Not to me or not that I'm aware of.

 4   **Q.**   Now, we talked a minute about a videotaped interrogation.

 5   Government's Exhibit No. 2 is a CD copy of that interrogation.

 6        Did you have a chance to view that video in the last

 7   couple days?

 8   **A.**   Yes.

 9   **Q.**   And is the disk a true and accurate depiction of that

10   video as it took place back in June of 2017?

11   **A.**   Yes.

12           **MR. MAHONEY:**  Your Honor, at this time we'd ask leave

13   to publish Government's Exhibit No. 2.

14           **THE COURT:**  Sure.  Okay.

15        Noel, will you switch to the computer, please.

16           **MR. MAHONEY:**  We have it in our desk top.

17   Mr. Padilla is going to bring it up.

18           **THE COURT:**  Oh, okay.

19           **MR. MAHONEY:**  Judge, we're having an audio problem.

20           **THE COURT:**  Okay.

21        (Government's Exhibit No. 2 was played.)

22           **THE COURT:**  Do you have any further questions of the

23   witness?

24           **MR. MAHONEY:**  No, we don't, Your Honor.

25           **THE COURT:**  Okay.  Mr. Bosch.

1                          **CROSS-EXAMINATION**

2      **BY MR. BOSCH:**

3      **Q.**   So in the early part of the interview, you had some reason

4      to believe that he wasn't well, didn't you?

5      **A.**   Like I explained, he was yawning, and he kind of had a

6      guarded defensive posture.  And I didn't know if he just didn't

7      want to be there or if he wasn't feeling well, so I asked him

8      if he was feeling okay.

9      **Q.**   And then what did you ask him next?

10     **A.**   I didn't ask him anything.  It was Detective Carillo.

11     **Q.**   Detective Carillo asked him if he was drug sick?

12     **A.**   Yes.

13     **Q.**   Did you think he was drug sick?

14     **A.**   I mean, I had known, from prior information of working

15     this case, that he did use.  Like I said, as far as my

16     experience, I didn't feel like he was under the influence.

17     Because when I've dealt with people under the influence of

18     heroin, they have a hard time staying awake.  It is called "on

19     the nod."  They're slouched over.  They are not able to pay

20     attention.  And from my time with Mr. Smith, he was responsive.

21     He did yawn.  He did -- like I said, I didn't know if he was

22     just in a bad mood for being there or if he didn't feel well;

23     but he was responsive, and I didn't feel like his condition was

24     such that he couldn't understand what was going on.

25     **Q.**   His body language didn't suggest anything to you?

 1   **A.**    To me, he looked defensive and guarded.  I mean, there's

 2   been a lot of interviews that I've conducted where people keep

 3   their arms in their shirt because they are cold or because they

 4   are being defensive.

 5   **Q.**    Could he have been cold?

 6   **A.**    He could have.

 7   **Q.**    He didn't have a shirt on, did he?

 8   **A.**    He had a polo on.

 9   **Q.**    Okay.  Draped over him?

10   **A.**    I'd have to review the video again.  He had it over him at

11   some -- he had his arms inside of his shirt, it appeared.

12   **Q.**    Okay.  Detective, just so I'm clear, it is your testimony

13   here today that on June 23rd during that 13-minute interview

14   Richard Smith seemed like a normal human being to you?

15   **A.**    Richard Smith seemed like the Richard Smith that I knew,

16   'cause like I said, from -- I had dealt with him on one prior

17   occasion.  I had other evidence that I reviewed where we were

18   able to observe and listen to Richard Smith, and Richard Smith

19   seemed like the Richard Smith that I was familiar with.

20   **Q.**    And you're familiar with Richard Smith the junkie, right?

21   **A.**    He was a user, yes.

22   **Q.**    Thank you.

23          **MR. BOSCH:**  Nothing further.

24          **THE COURT:**  Mr. Mahoney, do you have anything else?

25          **MR. MAHONEY:**  No, we don't, Your Honor.

 1              **THE COURT:**  All right.  Sir, thank you.  Step down.

 2        Do you have any additional witnesses, Mr. Mahoney?

 3              **MR. MAHONEY:**  No, Your Honor.

 4              **THE COURT:**  Mr. Bosch.

 5              **MR. BOSCH:**  Call Richard Smith.

 6              **THE COURT:**  Okay.  Good morning, Mr. Smith.  If you

 7    would, please raise your right hand to take an oath, and this

 8    lady right here will swear you in.

 9        *(The oath was administered.)*

10              **THE WITNESS:**  Yes, ma'am.

11              **THE COURT:**  You may be seated.

12                    RICHARD SMITH, DEFENDANT, SWORN

13                          **DIRECT EXAMINATION**

14    **BY MR. BOSCH:**

15    **Q.**   Could you state your name, please.

16    **A.**   Richard Smith.

17    **Q.**   And you're one of the defendants in this case, right?

18    **A.**   Yes, sir.

19    **Q.**   In the movie we just saw -- or the video we just saw --

20    you've seen that video before, haven't you?

21    **A.**   Yes, I have.

22              **THE COURT:**  Mr. Smith, can I ask you to just speak

23    into the microphone so I can hear you.

24    **A.**   Yes, I have.

25    \\\

1  BY MR. BOSCH:

2  **Q.**   And I brought it to you in the Lake County Jail, and we

3  watched it together, didn't we?

4  **A.**   Yes.

5  **Q.**   Okay.  And Friday, I came to the jail and told you about

6  today's hearing, and we prepared for today's hearing, didn't

7  we?

8  **A.**   Yes.

9  **Q.**   Do you remember I asked you how long you had been in

10  custody when they took that video?

11  **A.**   Yes.

12  **Q.**   And what did you tell me?

13  **A.**   I was arrested June 21st and to the 23rd, two days.

14  **Q.**   Okay.  And I asked you, didn't I, if -- did you tell me

15  you were high during that interview?

16  **A.**   Yes.

17  **Q.**   Okay.  And Friday did I ask you how you could have been

18  high if you had been in custody for two days?

19  **A.**   Yes, sir.

20  **Q.**   How were you high?

21  **A.**   Well, when they locked me up, they didn't search me very

22  well, and I had about four, five bags of heroin in my pocket.

23  'Cause if I was locked up for two days, I would have been sick.

24  I wouldn't have been able to talk to them or anything.  I would

25  have been throwing up and everything because I shoot dope

 1    intravenously.  I would have been very, very sick for two days

 2    in a cold cell.

 3    **Q.**   How did you take the heroin?

 4    **A.**   I snorted it.

 5            **MR. BOSCH:**  No further questions.

 6            **THE COURT:**  Okay.  Mr. Mahoney.

 7                        **CROSS-EXAMINATION**

 8    **BY MR. MAHONEY:**

 9    **Q.**   Mr. Smith, you were brought here to the federal building

10    for an initial appearance shortly after that videotaped

11    interview we just watched, right?

12    **A.**   Yes.

13    **Q.**   That was on June the 23rd --

14    **A.**   Yes.

15    **Q.**   -- 2017, correct, sir?

16    **A.**   (No audible response.)

17    **Q.**   And when you got here, you were interviewed by probation,

18    is that right?

19    **A.**   Yes.

20    **Q.**   And the probation officer asked you a bunch of questions

21    about --

22    **A.**   Yes.

23    **Q.**   -- who you are, what you do, where you lived, those sorts

24    of things, right?

25    **A.**   Yes.

1   **Q.**   Also asked you about your substance abuse history,

2   correct?

3   **A.**   Yes.

4   **Q.**   And you acknowledged to the probation officer that you

5   used cocaine, right?

6   **A.**   (No audible response.)

7   **Q.**   You have to answer yes or no, sir.  I'm sorry.

8   **A.**   Yes.

9   **Q.**   And you acknowledged to the probation officer that you

10  used heroin?

11  **A.**   Yes.

12  **Q.**   And you told the probation officer that you used cocaine

13  and heroin on a daily basis, is that right?

14  **A.**   Yes.

15  **Q.**   And the probation officer also asked you, "When was the

16  last time that you used a controlled substance," and you told

17  him, right?

18  **A.**   Yes.

19  **Q.**   Did you tell the probation officer that you snuck five

20  bags of heroin into the jail and used it?

21  **A.**   Why would I do that?  No.

22  **Q.**   Well, I don't know.  I'm asking you, sir.

23  **A.**   No.

24  **Q.**   Did you tell him that?

25  **A.**   No.

1   **Q.**   Did you tell the probation officer that the last time you

2   used drugs was on June 20th?

3   **A.**   I don't remember when I told her, but I wouldn't tell her

4   I used it that day if I did.

5   **Q.**   Pardon me?

6   **A.**   If I did, I wouldn't have told her I used.

7   **Q.**   You wouldn't have told the probation officer you used

8   drugs that day?

9   **A.**   Right.   Right.   No.

10   **Q.**   Okay.   So if you told the probation officer that the last

11   time you used drugs was June 20th, that was a lie, correct?

12   **A.**   I didn't tell her that.

13   **Q.**   Okay.   Now, you just watched the video, correct?

14   **A.**   Yes.

15   **Q.**   And when you watched that video, you are telling us that

16   you were high, correct?

17   **A.**   Yes.

18   **Q.**   You were -- and just so we're clear here, you're addicted

19   to narcotics, correct?

20   **A.**   Yes.

21   **Q.**   You're addicted to cocaine?

22   **A.**   And heroin.

23   **Q.**   And heroin.

24        And you used both of them?

25   **A.**   Yes.

1   **Q.**   Right.

2        So you weren't -- because you used five bags of heroin --

3   when did you use the five bags of heroin?  Was it the day of

4   the interview, the day after?

5   **A.**   The whole day.

6   **Q.**   So you kept --

7   **A.**   The whole -- every day.  I kept -- every day.  I snorted

8   some, then I fell asleep, got woke up, snorted some more, fell

9   asleep.

10  **Q.**   So is it your testimony that the whole time you were in

11  the custody of the Hobart Police Department --

12  **A.**   Yes.

13  **Q.**   -- you were getting high?

14  **A.**   Yes, I was.

15  **Q.**   Okay.  So you were high during the interview --

16  **A.**   Yes.

17  **Q.**   -- the videotaped interview we just watched?

18  **A.**   Yes.

19  **Q.**   And you were not dope sick?

20  **A.**   No, I was high.

21  **Q.**   You were high, but you weren't dope sick, right?

22  **A.**   No.

23  **Q.**   You weren't in withdrawal?

24  **A.**   No.

25  **Q.**   You weren't falling asleep?

1   **A.**   No.

2   **Q.**   You weren't vomiting?

3   **A.**   When you withdrawal, you don't fall asleep, when you

4   withdrawal.

5   **Q.**   Okay.  But you weren't vomiting?

6   **A.**   No.  No, none of that.

7   **Q.**   You didn't have diarrhea?

8   **A.**   No.

9   **Q.**   You didn't have any cramping, right?

10  **A.**   No.  When I got here, I was still high.

11  **Q.**   Okay.  So when the detectives -- Detective Wardrip and the

12  other detectives were interviewing you, you knew what was going

13  on, right?

14  **A.**   The whole time.

15  **Q.**   The whole time, right?

16  **A.**   The whole time I was high, no.

17  **Q.**   No, you were high, but you knew what they were asking you,

18  and you knew the answers?

19  **A.**   I was -- I was saying -- I'm just saying anything.  I was

20  saying stuff that was on my state case.  I was quoting that,

21  quoting things that were on my state case.  That's what I was

22  doing.

23  **Q.**   Well, when the detectives asked you about your role in

24  the --

25  **A.**   Yes, I quoted off my state discovery.  I quoted somebody

1   off my state discovery.  That's what I did.  I quoted them.

2   **Q.**   All right -- did you tell --

3   **A.**   Because they --

4          **THE COURT:**  Hang on, sir.  Let him ask the question.

5   Then you can answer.

6          **THE WITNESS:**  I'm sorry.

7   **BY MR. MAHONEY:**

8   **Q.**   Sir, did you tell Detective Wardrip, Detective Carillo,

9   and Detective Clark that you just worked security for the

10  organization on Massachusetts?

11  **A.**   Yes, I told them that because it was on my state

12  discovery.

13  **Q.**   Okay.

14  **A.**   But somebody else told them they worked security, and

15  they -- (undiscernible) I just say what he said.  That's all.

16  **Q.**   But you said, "I did that," didn't you?

17  **A.**   Uh-huh.  He said the same thing.

18  **Q.**   No, I'm asking you what you said to the detectives.

19  **A.**   Yeah.  Yeah, I said that.  Yeah.

20  **Q.**   You said, "I just worked security," correct?

21  **A.**   Yeah.  Something came to my mind.  That's the first thing

22  that came to my mind.

23  **Q.**   And you used walkie-talkies?

24  **A.**   That's the first thing that came to my mind.  I saw it on

25  my state discovery.

1   **Q.**   And some of the questions that you were asked you answered

2   truthfully, correct?

3   **A.**   Yeah.

4   **Q.**   And some of the questions you didn't answer truthfully,

5   did you?

6   **A.**   I didn't answer at all.  I didn't answer at all.

7   **Q.**   And some of them you didn't want to answer, right?

8   **A.**   (No audible response.)

9   **Q.**   Some of the questions you didn't want to answer --

10  **A.**   Some of them I didn't know the answer to.

11  **Q.**   Some of the questions you didn't want to answer were about

12  who worked -- who were the other workers in the organization,

13  correct?

14  **A.**   I didn't know the answer to those questions because I only

15  been there a couple of days.

16  **Q.**   Okay.

17  **A.**   Every day, every now and then.  I wasn't there -- I was

18  there getting high.

19  **Q.**   Okay.

20  **A.**   I was coming to that trap house to get high, that's it.

21  Getting high, that's what I was doing, getting high.

22  **Q.**   Okay.  Okay.  Also, you told the detectives you didn't

23  want to end up like "Kitchen," right?

24  **A.**   Yeah, because detectives, they stopped me.  They stopped a

25  couple times and asked me, "What happened to Kitchen."

1          And I told them I didn't know.

2          They said, "Who killed Kitchen?"

3          "I don't know.  I don't know."  That's what I told them,

4     "I don't know."

5     **Q.**   Well, you knew who Kitchen was, right?

6     **A.**   Yeah, I got high with Kitchen, get high with Kitchen.

7     **Q.**   Okay.  And you knew Kitchen sold drugs on Massachusetts,

8     the same place you were working security, correct?

9     **A.**   Yeah.  I bought drugs from Kitchen.  I bought drugs from

10    Kitchen to get high, yeah.

11             **MR. MAHONEY:**  Could I have one moment, Judge?

12             **THE COURT:**  Sure.

13             **MR. MAHONEY:**  I have no further questions.

14             **THE COURT:**  Do you have any redirect, Mr. Bosch?

15             **MR. BOSCH:**  Yes.

16                         **REDIRECT EXAMINATION**

17    **BY MR. BOSCH:**

18    **Q.**   Let me go back just so everybody is clear.

19          You got arrested in the outside of the Lake County

20    criminal court?

21    **A.**   No, right outside the courtroom.

22    **Q.**   Right, outside of the courtroom.  Okay.

23          And you were there because you had been charged with --

24    **A.**   Possession.

25    **Q.**   -- possession, visiting a common nuisance?

1    **A.**    Yeah.

2    **Q.**    Was that case the same case as this case?

3    **A.**    Yes, it is.

4    **Q.**    And at that time, it had been pending for a while, had it

5    not?

6    **A.**    Right.

7    **Q.**    And you had a lawyer representing you in state court,

8    correct?

9    **A.**    Yes.

10   **Q.**    And he furnished you with the discovery that the state had

11   given him, correct?

12   **A.**    Yes.

13   **Q.**    So when you're talking about, "I saw that in my

14   discovery," you're talking about the discovery that your state

15   court lawyer had given you a copy of?

16   **A.**    Yes.

17   **Q.**    Okay.  Thank you.

18            **MR. BOSCH:**  Nothing further.

19            **THE COURT:**  Just by way of -- well, do you have any

20   further questions?

21            **MR. MAHONEY:**  No I don't.

22            **THE COURT:**  All right.  Sir, you can step down.

23      Do you guys mind bringing him back to the table?

24      Can I just ask, just by way of proffer, was he in custody

25   on the state case?

 1           MR. BOSCH:  No.  He bonded out.

 2           THE COURT:  I see.

 3       And then he was arrested outside the courtroom on the

 4   federal case?

 5           MR. BOSCH:  Yes, and the state case has since been

 6   dismissed.

 7           THE COURT:  I see.  Okay.

 8       Okay.  Do you have any other witnesses?

 9           MR. BOSCH:  No, Your Honor.

10           THE COURT:  All right.  So I'll hear from you first,

11   Mr. Bosch.  What's your position about why I should suppress

12   these statements?

13           MR. BOSCH:  Your Honor, I want to thank you for

14   having the hearing and watching the video because that's

15   exactly what I wanted and all I wanted.  I'm aware that the

16   case law lets you do pretty much whatever you want to do.

17           THE COURT:  Well, I mean, listen, let me just -- let

18   me be specific here.  It appears to me he is in some way

19   impaired during the video, that he's not of a right mind.  The

20   person I'm seeing here on the stand seems a little different

21   than the person I'm seeing in the video.

22       But, kind of, so what?  How does that show that his

23   statements are being coerced or he's being threatened?

24       There's just an abundance of case law that says, even if

25   he's stone-cold drunk, the statements can be used against him.

1   That doesn't make them not coerced or it doesn't make them

2   coerced.

3        **MR. BOSCH:**  I don't think, and we haven't alleged,

4   that he was coerced.  What we have alleged is that because of

5   being high his waiver was not knowing or voluntary.  He signed

6   the waiver.  We're just saying in his mental state he couldn't

7   have knowingly and voluntarily done that.

8        **THE COURT:**  Well, I don't know.  He definitely

9   contemplates the signing of the waiver.  You could see his mind

10  is racing, and it's clear to me he understands the nature of

11  the warnings that are being given against him, and he's

12  conflicted about what to do.  And he makes a rational choice to

13  sign the waiver and start talking.

14      I mean, isn't that what we see on the video?

15       **MR. BOSCH:**  Well, I think there's a presumption that

16  there is no waiver, and it's the government's burden to prove

17  that it was, and I think that burden is a

18  beyond-a-reasonable-doubt burden.

19       **THE COURT:**  I don't think that's the case, but all

20  right.

21      Mr. Mahoney.

22       **MR. MAHONEY:**  Judge, briefly.  I think I made my

23  arguments in my filing.

24      However, just to summarize, first of all, what you have

25  before you in this motion today is a man who was given his

1    constitutional rights per the *Miranda* rule.  As you said, he

2    followed along -- or appeared to be following along with the

3    detective.  You have a legible signature on the signature page

4    of Richard Smith.  He agrees to speak to them.

5        The only issue is -- and we would concede, yeah, he

6    probably was high.  He's a drug user.  He admitted it on the

7    witness stand that he used drugs every day.  We are not

8    disputing that fact.  But the fact that he was under the

9    influence of drugs at the time that he gave his statement does

10   not negate the voluntariness of the statement without police

11   coercion.  There is no police coercion here, as you saw it.

12       Did that video get a little bit heated at times where

13   there was some raised voices?  Yes, certainly.  It is not a

14   nice, easy business always.  But that doesn't mean

15   Richard Smith's statements were not voluntarily given after he

16   made a knowing and voluntary waiver of his constitutional

17   rights.

18       Everything is in order in this case, Your Honor, and I

19   don't believe there's any issue at all as to whether or not

20   this statement was voluntarily given.  And it is our burden.  I

21   think we have met our burden by a preponderance of the

22   evidence, which is the standard the Court should review this

23   testimony.

24           **THE COURT:**  All right.  Mr. Bosch, anything else,

25   from your perspective?

1      **MR. BOSCH:**  Nothing further, Your Honor.

2      **THE COURT:**  Okay.  I will take the matter under

3   advisement, and I'll get an opinion out to you very shortly.

4   We have a lot going on, so shortly is a flexible term here.

5      Let me ask, more generally:  What's going on in this case?

6      I was reviewing the docket.  And this isn't germane just

7   to Mr. Smith.  I'm talking sort of broader here.  It has been

8   in the system, I don't know, almost a year -- or, you know,

9   eight, nine months.  I guess it was June.

10      **MR. MAHONEY:**  June.  June 22nd.

11      **THE COURT:**  Yeah, okay.  So I'm -- can you tell me

12   what's going on with discovery?  There's not even a trial date.

13   What's happening here?

14      **MR. MAHONEY:**  Well, what happened in the case, Judge,

15   I'm sure you saw, is Judge Martin asked if this was going to be

16   declared a complex case, and it is because obviously there's 19

17   or 20 defendants.  There's a massive amount of discovery.  We

18   have made, I believe, four productions of discovery to all

19   counsel.  We do have one more production of discovery, possibly

20   two, to tie it up, and then we would be ready to -- Mr. Bosch,

21   I think, is the first one to file a motion in the matter so --

22      **THE COURT:**  No one has pled guilty yet or taken a

23   plea or anything?

24      **MR. MAHONEY:**  No, nobody has pled guilty yet.  There

25   are -- the investigation does continue.

 1          **THE COURT:**  Okay.  Well, just to let you know, I'm

 2    going to tell Magistrate Judge Martin we've got to get this

 3    thing going.  And, you know, there's -- I've got too many cases

 4    in the system that are sitting around for too long, and this is

 5    not necessarily one of them, but it's getting close.

 6          **MR. MAHONEY:**  No, I understand, Your Honor.

 7          **THE COURT:**  And so, you know, we have got to move

 8    these cases from A to B, and so I just want you to be sort of

 9    cognizant of that and sort of where I'm coming from, that we

10    are going to start pushing these, okay?

11          **MR. MAHONEY:**  No, I appreciate that.  Yes, sir.

12          **MR. BOSCH:**  Your Honor, if I may?

13          **THE COURT:**  Yeah, Mr. Bosch.

14          **MR. BOSCH:**  We do have -- our next court date in this

15    case is a status date on March 8th.

16          **THE COURT:**  Yes, I saw that in the docket, and that's

17    what I'm sort of letting Mr. Mahoney know, that I'm going to

18    tell Magistrate Judge Martin that, "You've got to set a trial

19    date.  We have got to get this thing on the docket, on the

20    calendar so that everybody knows the date they are working

21    towards and then, you know, bring this to a resolution."

22          **MR. MAHONEY:**  Certainly.

23          **THE COURT:**  So you might have a less flexible Judge

24    Martin the next time you see him.

25          **MR. MAHONEY:**  Okay.

1        **THE COURT:**  All right.

2        **MR. MAHONEY:**  Thank you.

3        **THE COURT:**  All right.  As I mentioned, I'll take

4    this under advisement.  Thank you.

5        **MR. BOSCH:**  Thank you.

6        **THE COURT:**  And would you mind leaving that?  You had

7    given me a courtesy copy of it, if I could have that back.

8        **MR. MAHONEY:**  This is yours that we used today, so we

9    are going to leave it with the Court.

10       **THE COURT:**  Great.  Thank you.

11       **MR. MAHONEY:**  Thanks, Judge.

12       (A recess was had at 10:56 a.m.)

13

14   * * *

15       (End of requested transcript.)

16                        CERTIFICATE

17       I, Stacy L. Drohosky, certify that the foregoing is a true

18   and correct transcript from the record of proceedings in the

19   above-entitled matter.

20   Date:  March 4, 2019

21                                S/Stacy L. Drohosky
                                 S/STACY L. DROHOSKY
22                               Court Reporter
                                 U.S. District Court
23

24

25